# UNITED STATES DISTRICT COURT

**EASTERN** DISTRICT OF **CALIFORNIA** FILED

—oOo—

OCT 1 5 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

JAMES K. DIXON

(in custody of U.S. Marshals Service)

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER:

2 08 - MJ - 0 3 6 4   KM

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about **September - October 2007** in **Sacramento** County, in the Eastern District of California defendant(s) did, (Track Statutory Language of Offense)

▸ **knowingly execute and attempt to execute a scheme and artifice to defraud a federally insured financial institution and transport, transmit, and transfer in interstate commerce at least $5,000 in money, knowing the same to have been taken by fraud**

in violation of Title **18**, United States Code, Section(s) **1344 & 2314**. I further state that I am a(n) Special Agent of the Secret Service and that this complaint is based on the following facts:

▸ **See Attached Affidavit**

Continued on the attached sheet and made a part of this complaint:  **x**

Signature of Complainant SA KELLY SHINTAKU
U.S. Secret Service

Sworn to before me, and signed in my presence
October 15, 2008

at   Sacramento, CA

**Date**

**City**          **State**

HON. KIMBERLY J. MUELLER, U.S. Magistrate Judge

**Name of Judge**          **Title of Judge**

Signature of Judge

## AFFIDAVIT FOR ARREST WARRANT

I, Kelly M. Shintaku, a Special Agent of the United States Secret Service, being duly sworn, do hereby depose and state the following:

1.      The facts in "Affidavit for Criminal Complaint" in United States v. Donald Taylor, 2:08-MJ-0182 GGH, are true, incorporated herein, and attached for the Court's convenience.

2.      I respectfully submit this affidavit in support of the United States' application for a warrant to arrest **James Kevin Dixon, aka Cheez,** DOB 10/30/1970.

3.      Based on the facts set forth herein, there is probable cause to believe that **James Kevin Dixon,** violated 18 U.S.C. §§ 1344, 2314. Under Section 1344, it is a felony to knowingly execute or attempt to execute, a scheme or artifice to 1) defraud a financial institution, or 2) obtain any of the moneys or funds owned by or under the custody or control of a financial institution by fraudulent pretenses. Under Section 2314, it is a felony to transport, transmit, or transfer in interstate or foreign commerce any goods, securities or money of the value of $5,000 or more, knowing the same to have been stolen or taken by fraud.

4.      In this affidavit, I rely on facts personally observed by me, related to me by other law enforcement officers or agents, bank investigators and business records I have reviewed. I have not included every fact known to me, but rather only those necessary to establish probable cause.

## Probable Cause

5.      On or around 10/31/07, Detective Andy Knight, of the Bozeman Police Department, (BPD) Bozeman, Montana contacted FBI SA Greg Rice and advised that the (BPD) and the Livingston Police Department (LPD) had separately conducted fraud investigations into reports by several victim banks. That investigation determined that during September 2007 approximately eleven banks in Bozeman and Livingston, MT were victimized through a cash advance fraud scheme which resulted in approximately $63,500 in actual loss to banks in those cities. Detective Knight told FBI SA Rice that another $36,500 in attempted thefts/loss at a few other banks had also occurred. Detective Knight's investigation determined that the scheme was perpetrated by a white female in her early 20's, later identified as Patience D. Isaacs of Mckee, Kentucky.

6.      The Montana victim banks filed fraud reports with the BPD and the LPD. LPD Detective Michelle Morris provided copies of her reports, including suspect photographs and video surveillance tapes to Detective Knight. Detective Knight provided these reports to FBI SA Rice. FBI SA Rice has reviewed both the LPD and BPD investigative reports, including the suspect photographs, witness statements, and video surveillance.

7.    In reviewing the reports FBI SA Rice determined that the separate victim banks reported the exact same scheme. Those reports in essence describe a white female, later identified as Patience Isaacs, would enter the bank and present a credit card and/or a debit card to the bank teller and ask to get a credit card cash advance. The female suspect also was described by bank tellers as having a southern accent. The amounts requested were typically, $9000, $9500, $8000, and $8500.

8.    In some instances, the teller would swipe the card through the bank's card reader. Typically the card would read "declined," signifying that the card's account did not have sufficient funds to cover the advance. Isaacs would then instruct the teller to call a customer service number which Isaacs purported to be the credit card company's customer service number. In some instances Isaacs would dial a phone number which purported to be customer service and in others Isaacs provided the number to the teller who then dialed the number.

9.    Detective Knight and FBI SA Rice have concluded that the person on the other end of the line was an accomplice of Isaacs. One of the phone numbers provided by Isaacs was that of 1-866-679-1895. That phone number was later determined by BPD to be disconnected. Once contact was made with "customer service," the customer service representative then provided personal identifiers to the teller for Isaacs.

10.   The customer service representative would then tell the teller to hit a series of buttons on the card reading machine. The customer service person would also tell the teller to enter a verification number. The teller would then follow that person's instructions and subsequently in most instances the card would then clear and cash would be given to Isaacs.

11.   I am aware that the credit card cash advance scheme described above is a well known scheme to the FBI and the U.S. Secret Service. The scheme has been identified as being perpetrated by other criminals to defraud a number of banks throughout the United States.

12.   Detective Knight told FBI SA Rice that he was able to identify Isaacs as the perpetrator of these financial crimes based upon evidence that he collected in reports from the victim banks in Bozeman, Montana and Livingston, Montana. That evidence included copies of Isaac's Kentucky driver's license, video surveillance photographs, witness statements, and a physical description of Isaacs.

13.   In approximately five of the fraudulent instances, Isaacs left a copy of her Kentucky drivers license or provided her Kentucky drivers license number. Identification was also made possible by the fact that Isaacs provided her name and signature "Patience Isaacs" on banking receipts after getting the cash advances.

14.   Detective Knight conducted a records check with the Kentucky Department of Motor vehicles to confirm the existence of a Kentucky driver's license for Patience D. Isaacs, a white female, 5'4", with hazel eyes. Both Detective Knight and FBI SA Rice

2

obtained a current copy of the true Kentucky driver's license for Isaacs and compared the DL photo and record to that of the copied DL left by Isaacs at the bank branches. The two driver's licenses are identical and contain the same photograph, name, and address, date of birth, license number and physical description. LPD Detective Morris also obtained two additional drivers license photographs for Isaacs from prior years when Isaacs was younger. FBI SA Rice and Detective Knight have also reviewed these photographs and determined that they reasonably match the current Kentucky driver's license photograph of Patience Isaacs.

15.    Detective Knight and Detective Morris also obtained quality photographs from bank surveillance systems from a few of the victim banks and provided these to FBI SA Rice. FBI SA Rice has reviewed the suspect photos and determined that they reasonably matched Isaac's driver's license photographs.

16.    The victim banks which suffered losses were Rocky Mountain Bank, Bozeman, MT, First National Bank, Four Corners, MT, Manhattan State Bank, MT, American Federal Savings Bank, Bozeman, MT, Sky Federal Credit Union, Bozeman, MT, Bank of the Rockies, Livingston, MT, First Interstate Bank, Livingston, MT, and Sky Federal Credit Union, Livingston, MT. The victim banks which reported attempts were First National Bank, Bozeman, MT, American Bank, Bozeman, MT and First Security Bank, Bozeman, MT.

## VICTIM BANK - FIRST NATIONAL BANK, FOUR CORNERS, MT

17.    On 9/7/07 the First National Bank (FNB) in Four Corners, MT was victimized by the same scheme. FNB suffered a cash loss of $9000. Detective Knight obtained evidence from this bank in the form of video surveillance and photographs of the suspect. FBI SA Rice has reviewed the surveillance photographs from this bank. The female suspect depicted in those photographs reasonably matched the driver's license photographs known to belong to Patience D. Isaacs. Detective Knight also obtained a copy of the transaction receipt. FBI SA Rice has reviewed this receipt and it clearly contains the printed name of Patience Isaacs and the signature of Patience Isaacs with driver license number similar to Isaacs's Kentucky DL and an address identical to the home address listed on Isaacs's Kentucky DL.

18.    The teller in this instance, Whitney Waylander, verified that the picture and signature matched the driver's license and matched the suspect who was making the cash advance request. Waylander was suspicious of the transaction and informed her manager, Todd Kitto, of her suspicions. Kitto watched the suspect leave the bank and enter a silver 4-door Chrysler with Montana plate number AHE291. Kitto remembered seeing two other people in the vehicle one male and one female. He saw the other female come into the bank and use the restroom. Kitto also observed the suspect exit the bank and approach the vehicle and hand the envelope with the cash to an unknown male in the car. Video surveillance of the second unidentified female was captured and provided to Detective Knight. FBI SA Rice also reviewed the photograph of the unidentified female. Detective Knight ran a vehicle license check using the license plate number provided by Kitto. The

vehicle returned to a 1999 silver Chrysler 300, registered owner of Victoria M. Stickler, Bozeman, Montana. Detective Knight obtained a Montana driver's license photograph of Stickler and matched it to the female passenger from the surveillance video. He verified Stickler's residence.

## INTERVIEW OF VICTORIA STICKLER

19. On 10/26/2007, FBI SA Rice and Detective Knight interviewed Victoria M. Stickler. Stickler advised that during September and early October 2007 she associated with a black male known as Kevin, last name unknown (LNU) and his girlfriend Patience LNU. She knew these individuals only by their first names. Stickler knew Kevin LNU through Stickler's association with Stickler's friends Janet Thomas and Judy Spano who have a residence in the same apartment complex in which Stickler resides.

20. Stickler advised that Kevin LNU frequently stayed with Spano and Thomas and was under house arrest at one of Spano's residences for an unknown criminal violation. Stickler was aware that Kevin LNU had a criminal history and may have been "pimping" out Janet Thomas. Stickler provided a physical description of Kevin LNU as that of a black male, 40 years of age, 5'10", 160 pounds, thin build, balding, dark hair, with tattoos on his arms and neck. Stickler provided a physical description of Patience LNU as a white female, in her 20's, brown hair, 5'5", 140 pounds, thin build, with a crooked space between her teeth. Stickler stated that Patience LNU also spoke with a southern accent. This information is similar with the physical descriptions of both Isaacs and Dixon known to law enforcement. Moreover the description by Stickler regarding Isaacs having a crooked space between her teeth is consistent with a one of the three driver's license photographs obtained by SA Rice of Isaacs which show that she has a noticeable gap in her front teeth.

21. Detective Knight showed Stickler a bank surveillance photograph dated 10/7/07 at 1:00 p.m. The photograph was that of a white female. Stickler identified the individual in that photograph as the person she knew to be Patience LNU. Detective Knight also showed Stickler a photograph of a white female on bank video surveillance. Stickler advised that the person in the photograph was that of herself. She recalled entering one of the banks to go to the restroom.

22. During the interview SA Rice also showed Stickler an unmarked driver's license photograph of a white female. She positively identified this photograph as the person she knew to be Patience LNU. The true identity of the person in that photograph is that of Patience D. Isaacs the defendant.

23. On 10/29/07 SA Rice showed Stickler an unmarked photograph of a black male with a tattoo on his neck. Stickler positively identified this individual in the photograph as the person she knew to be Kevin LNU. The true identity of the individual in the photograph is that of Kevin James Dixon. Kevin LNU will be referred herein as Kevin Dixon (Dixon). Patience LNU will be referred herein as Patience Isaacs (Isaacs).

4

24. Stickler advised Dixon did not have a personal vehicle at the time that he was residing in Bozeman. Sometime during September 2007 Dixon asked Stickler to drive him and Isaacs around to various banks around Bozeman, Montana. He said that he and Isaacs were seeking to obtain a car loan and needed her to drive them because they did not have transportation. Stickler agreed to take them around the Bozeman area. Over a period of a few days she drove them to approximately 10 banks around Bozeman. Dixon gave Stickler $40 for gas for her trouble. He also told her that if he obtained the loan that he would help her out financially. Stickler was not aware that the two were engaged in any fraud. She did not take part of any fraud and did not receive any proceeds from any fraud scheme.

25. Stickler advised that while she drove them around to the captioned banks, on a number of occasions she overheard Dixon say to Isaacs; "do you have the card?" He primarily said this to Isaacs as she was leaving Stickler's vehicle and on her way into the banks. Isaacs typically responded "yes" to his questions. Stickler observed that during a couple of visits to these banks that Isaacs carried her identification with her into the bank.

26. Stickler also heard Isaacs tell Dixon on one occasion after she exited an unspecified bank and entered Stickler's vehicle that the teller had essentially told Isaacs that if she brought back more documentation at a later time that Isaacs could then get the $9000 dollars. Stickler did not know what this meant and did not know at the time that it referred to a fraudulent act.

27. On another occasion Stickler observed that when Isaacs returned to Stickler's vehicle Dixon asked Isaacs "did you get it?" Isaacs responded "yes". Stickler also observed Isaacs exiting each bank with a white envelope in her hand and described it as an envelope that a bank customer would place cash into. Stickler believed the envelope contained cash.

28. Stickler told FBI SA Rice and Detective Knight that she still had Dixon's number saved in her cell phone. She spoke to Dixon on or around the evening of 10/25/07. He told Stickler that he and Isaacs were in Chicago and making their way to Atlantic City.

## SIMILAR FRAUDS COMMITTED AT BANKS IN INDIANA, WISCONSIN AND MINNESOTA

29. On or around 10/26/2007, FBI SA Rice spoke with John Magnuson who handles security and fraud investigations for Ready Financial Group, (RFG) Nampa, Idaho. RFG is the company that issues prepaid debit and credit cards. Magnuson advised that one of their VISA cards issued to a customer by the name of Patience Isaacs was used in the commission of a credit card cash advance fraud at a bank in Oakdale, Minnesota and a second bank in Eau Claire, Wisconsin. Magnuson advised that on or around 10/11/2007 customer Patience Isaacs attempted to get a cash advance for $9500 from Royal Credit Union in Eau Claire, Wisconsin. The transaction was declined. On 10/12/2007 customer Patience Isaacs withdrew $9,500 from a bank teller at Lake Elmo Bank in Oakdale, Minnesota. Magnuson provided SA Rice with a report detailing the events surrounding

5

the fraud. SA Rice reviewed this report and found that the customer's VISA account number was listed as 4750150020007271 and was in the name of Patience Isaacs.

30.    The documentation provided by Ready Financial stated that on or around 10/3/2007 Patience Isaacs called RFG to order a "READY" debit prepaid Visa card. According to RFG for every customer that orders a card, the company requires the following personal information: Full Name, Physical Address, Date of Birth, Taxpayer ID # (Social Security Account Number). RFG records indicate that the following information was provided to RFG: Patience Isaacs at an address in Minnesota. The company procedure is to verify that information using record checks through LexisNexis. In the case of Patience Isaacs the information she provided wasn't confirmed so the company asked that she fax the company a copy of her driver's license and proof of SSN before they would open the account.

31.    According to RFG on 10/3/2007 Patience Isaacs faxed the company a Kentucky DL. RFG confirmed the name address and DOB matched the information she provided to the company.

32.    RFG also received a letter from the Social Security Administration office in Brooklyn Center, Minnesota as acceptable proof that the SSN was valid an belonged to Patience Isaacs. The card account was subsequently opened on 10/3/2007. Magnuson provided FBI SA Rice a copy of the Kentucky driver's license faxed to them by Isaacs. The driver's license and photo is identical to the driver's license presented at the various victim bank branches in Montana and described in the paragraphs above.

33.    On 11/12/07 Magnuson again contacted FBI SA Greg Rice. Magnuson advised that RFG's records indicated that on 11/10/07 customer Patience Isaacs, successfully committed another credit card cash advance for $9500 with an RFG issued debit card at Terre Haute Savings Bank, in Terre Haute, Indiana.

34.    FBI SA Rice is aware that based upon the information provided by Stickler and referenced in the paragraphs above, that at the end of October 2007 Dixon and Isaacs were in Chicago Illinois, and were headed to Atlantic, City New Jersey. FBI SA Rice is aware that the victim banks in Oakdale, Minnesota, Eau Claire, Wisconsin, are off of the Interstate 94 running through Minnesota and Wisconsin and would be the Interstate a person would use while traveling easterly out of Montana toward New Jersey. Terre Haute, Indiana is approximately 100 miles south of Chicago and is located on a state highway between Illinois and Kentucky.

## DIXON DEPOSITS INTO BARKSDALE ACCOUNTS

35.    On 9/7/07, **Kevin Dixon** went to a Wells Fargo Bank located at 211 West Main St, Bozeman, MT 59715 and made two cash deposit into account # 8249995419. One deposit was in the amount of $4,500.00 at 12:15 pm. The other deposit was in the amount of $4,500.00 at 2:35 pm. Photos of these transactions were taken at the time of the deposits. The man in both photos is the same and is wearing the same t-shirt. Based on a

comparison of these photos with photos known to be of **Kevin Dixon,** I have determined that the man in the Wells Fargo Bank is **Kevin Dixon.**

36.   The Wells Fargo bank account # 8249995419 belongs to Charles Barksdale, dba Stupid Entertainment. I have reviewed transactions from this account. In September 2007, there are no withdrawals or purchases. In October 2007, it is used for various purchases in the Sacramento area.

37.   On 10/10/07 at 6:27 pm **Kevin Dixon** went to a Wells Fargo Bank located at 7779 Afton Rd, Woodbury, MN and made a cash deposit at a drive-thru ATM machine. The deposit was made into Account #1889436083. The deposit was in the amount of $4,750.00. During the transaction video surveillance photographs were taken. The photo from the surveillance shows a black male in a vehicle making the ATM deposit. Based on known photographs of **Kevin Dixon** it is believed to be the same person.

38.   The Wells Fargo bank account #1889436083 belongs to Charles Barksdale. In October, that account had only one debit transaction, a $75 transfer to a savings account.

39.   Reference is made to paragraphs 16 through 30, 34, and 88, see my 5/16/08 Affidavit for Arrest Warrant for Donald Taylor.

## RECORD CHECK FOR KEVIN DIXON

40.   The following records were located for James Kevin Dixon: The NCIC Interstate identification Index showed that Kevin James Dixon, FBI#: 449671LA8 has the following aliases: Kevin Dixon, aka Kevin Dickson, aka James Devin Dixon, aka "Cheeze", aka Lonnie Allen, aka Brett Allen. NCIC records describe him as a black male, 6'0", 160 pounds, brown eyes, black hair, DOB 10/30/1970, and utilizing two Social Security Account Numbers. NCIC indicates that Dixon has tattoos on his abdomen, face, left hand and neck. NCIC shows that Dixon is a "multi-state offender" and has criminal histories in California, Nevada, South Dakota, Montana, Oregon, and Utah. These criminal offenses go back as far as 1986 and continue up and through 2006. His NCIC records indicate that has arrests for obstructing a public officer, possession of marijuana, grand theft, burglary false identification to police officers, fugitive from justice, carrying a loaded firearm, kidnapping 1st degree, felon in possession of weapon, theft in the 1st degree, robbery in the 1st degree, carrying a dangerous weapon, kidnapping 2nd degree, assault in the 2nd degree, parole violations, and failure to appear. The Gallatin County Sheriff's Office, Bozeman, Montana provided SA Rice with a copy of a photograph of Dixon and identifiers for him.

41.   On 10/14/08, I spoke with Becky Hill of the Montana U.S. Marshall's office. She informed me that at present **Kevin Dixon** is in custody in Big Horn County, Wyoming. She stated that **Kevin Dixon** will be in the Yellowstone County Detention Facility in Billings, MT on Friday, October 17, 2008.

## CONDUCT AFFECTED INTERSTATE COMMERCE

42.     Based on my training and experience in conducting bank and wire fraud investigations, I believe that the suspects' conduct affected interstate commerce. The suspects entered banks throughout the United States at which they withdrew funds. In these various cities in which the fraudulent withdrawals occurred, the suspects would send money back to Sacramento, often by depositing funds into Wells Fargo Bank accounts controlled by Barksdale.

43.     The transactions conducted at Wells Fargo Bank branches throughout the United States, to include, Montana and Arizona, affected interstate commerce, as did the withdrawals at banks doing business outside the State of California, including Rocky Mountain Bank in Bozeman, MT, First National Bank, American Federal Savings Bank and Sky federal Credit Union and others. These banks are headquartered in several different states, including but not limited to Arizona and Montana.

## CONDUCT AFFECTED FEDERALLY INSURED BANKS

44.     According to information I obtained from the Federal Deposit Insurance Corporation's website: http://www2.fdic.gov/idasp/main_bankfind.asp, Wells Fargo is a federally-insured bank that maintains branches at various locations in the State and Eastern District of California. In addition, Big Sky Western Bank, Rocky Mountain Bank, among others, are federally-insured banks. Sky Federal Credit Union is federally insured by the National Credit Union Administration (NCUA), a U.S. government agency.

//

//

//

//

//

//

//

//

//

//

8

## CONCLUSION

45. Based on the foregoing, there appears to be legally sufficient probable cause to believe that **James Kevin Dixon, aka Cheez** violated of 18 USC 1344 (Bank Fraud) and Section 2314 (Interstate Transportation of Stolen Goods) by participating with Charles Barksdale and others in a bank fraud scheme centered in Sacramento and executed all over the United States and by transferring bank fraud proceeds to Barksdale in Sacramento.

I swear under penalty of perjury that the above facts are true and correct to the best of my knowledge and belief.

Kelly M. Shintaku, Special Agent
United States Secret Service

Reviewed and approved as to form,

Matthew D. Segal
Assistant U.S. Attorney

Subscribed and sworn to before me this 15th day of October 2008, at Sacramento, California,

Honorable Kimberly J. Mueller
United States Magistrate Judge

9

AO 442 (Rev. 10/95) Warrant for Arrest

# UNITED STATES DISTRICT COURT FILED

## EASTERN DISTRICT OF CALIFORNIA   MAY 1 6 2008

—oOo—

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

### UNITED STATES OF AMERICA
### v.
### DONALD TAYLOR

## WARRANT FOR ARREST

CASE NUMBER:

## 2 0 8 - MJ - 0 1 8 2   GGH

YOU ARE HEREBY COMMANDED to arrest

and bring him or her forthwith to the nearest magistrate to answer a(n)

___ Indictment      ___ Information      _x_ Complaint      ___ Order of court      ___ Violation Notice      ___

charging him or her with (brief description of offense)

bank fraud

in violation of Title 18, United States Code, Section(s) 1344

| | |
|---|---|
| HON. GREGORY G. HOLLOWS | U.S. Magistrate Judge |
| Name of Issuing Officer | Title of Issuing Officer |
| GREGORY G. HOLLOWS | Sacramento, CA  May 14, 2008 |
| Signature of Issuing Officer | Date and Location |

Bail fixed at ___ No bail ___ by   HON. GREGORY G. HOLLOWS

Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at   3924 Stallion Way Sacramento |

| DATE RECEIVED | 5   14   08 | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|---|
| DATE OF ARREST | 5   15   08 | Kelly Shintoller | |

AO 91 (Rev. 12/03) Criminal Complaint 8/07

 

# UNITED STATES DISTRICT COURT

**FILED**

**EASTERN** DISTRICT OF **CALIFORNIA**

MAY 1 6 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA
v.

DONALD TAYLOR

**CRIMINAL COMPLAINT**

CASE NUMBER:

(Name and Address of Defendant)

**2 08 - MJ - 0 1 8 2    GGH**

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. Beginning no later than December 2007 and continuing until at least **February 12, 2008** in **Sacramento** County, in the Eastern District of California defendant(s) did, (Track Statutory Language of Offense)

▸ **knowingly execute and attempt to execute a material scheme to defraud a financial institution**

in violation of Title 18, United States Code, Section(s) **1344**. I further state that I am a(n) Special Agent of the Secret Service and that this complaint is based on the following facts:

▸ **See Attached Affidavit for Search, Arrest, and Seizure Warrants**

Continued on the attached sheet and made a part of this complaint: ✗

Signature of Complainant SA Kelly Shintaku
U.S. Secret Service

Sworn to before me, and signed in my presence
May 14, 2008                                          at     Sacramento, CA

Date                                                                          City                                          State

HON. GREGORY G. HOLLOWS          U.S.
Magistrate Judge

**GREGORY G. HOLLOWS**

Name of Judge                                                      Signature of Judicial Judge



## AFFIDAVIT FOR SEARCH, ARREST AND SEIZURE WARRANTS

I, Kelly M. Shintaku, a Special Agent of the United States Secret Service, being duly sworn, depose and state as follows:

## BACKGROUND

1.     I am a Special Agent with the United States Secret Service (USSS). I have been so employed since July of 2004. I am currently assigned to the Sacramento Resident Office. I have received training at the Federal Law Enforcement Training Center in Glynco, GA and the USSS Training Facility in Beltsville, MD. In November 2005, I attended the Basic Investigations of Computer and Electronic Crimes Program (BICEP) and received my BICEP certification. As part of my duties, I investigate offenses involving access device fraud, wire fraud, and bank fraud. In these capacities, I have become familiar with the investigation and prosecution access device fraud, wire fraud and bank fraud, including the use of various criminal methods to perpetrate these frauds.

2.     I have participated in numerous investigations to include cases involving access device fraud, counterfeiting of access devices, identity theft, wire fraud, mail fraud, bank fraud, and identity document fraud. Further, I have received extensive training regarding the investigation and prosecution of access device and bank fraud cases.

3.     Based on my training and experience from past bank fraud investigations and consultation with other law enforcement officers regarding various bank fraud investigations, I am aware that bank fraud schemes can involve many components, to include the use of pre-paid credit cards to obtain fraudulent cash advances from banks by various individuals at the direction of other co-schemers.

4.     I know that it is common for individuals engaged in fraud scheme to store and communicate this information in an electronic format – to include computers, cell phones, and electronic storage devices. These electronic media are mobile in nature and can readily be moved from location to location.

5.     I am familiar with the information contained in this affidavit based on: (i) direct knowledge of each of the following facts, or upon information provided to me by other law enforcement officers; (ii) information received from third parties, such as bank investigators. Not all of the facts known to me are included herein; I have only included those facts necessary to show probable cause exists to support my warrant requests.

## LOCATIONS TO BE SEARCHED/ITEMS TO BE SEIZED

6.     I respectfully submit this affidavit in support of the United States' application for a warrant to search the following residences, cell phones and computers, or computer media found at the residences/locations:

- **10070 Willard Parkway #232, Elk Grove, CA**

1



- **2451 Meadowview Road #801, Sacramento, CA 95832**
- **5924 Stallon Way, Sacramento, CA 95823**

7.    Based on the facts set forth in this affidavit, I believe there is probable cause to believe that items listed in Attachment "B" are fruits, evidence, instrumentalities, and proceeds, of violations of Title 18 U.S.C. Section 1344 – Bank Fraud.

8.    I respectfully submit this affidavit in support of the United States' seizure of all funds located in the below-listed accounts at the Wells Fargo Bank, which Wells Fargo Bank has confirmed are in the names of Charles E. Barksdale, Niesha Jackson and Stupid Entertainment:

- **# 1889436083**    **Charles Barksdale**
- **# 7193582496**    **Charles Barksdale**
- **# 8249995419**    **Stupid Entertainment (Barksdale is signer)**
- **# 8479433735**    **Charles Barksdale**
- **# 8785764823**    **Stupid Entertainment (Barksdale is signer)**
- **# 1171569617**    **Niesha Jackson**
- **# 1277546469**    **Niesha Jackson**
- **# 3265354401**    **Niesha Jackson**
- **# 7553471686**    **Niesha Jackson**
- **# 7912156853**    **Niesha Jackson**
- **# 8122885620**    **Niesha Jackson**

The accounts identified above are more fully described in Attachment "C", which is attached hereto and incorporated by reference.

9.    As described below, this affidavit sets forth probable cause to believe that Donald "Wooch" Taylor and others violated Title 18 U.S.C. Section 1344 – Bank Fraud. Under Section 1344, it is a felony to knowingly execute or attempt to execute, a scheme or artifice to 1) defraud a financial institution, or 2) obtain any of the moneys or funds owned by or under the custody or control of a financial institution by fraudulent pretenses.

10.    The funds identified in Paragraph 8 are subject to civil forfeiture based on 18 U.S.C. Section 981 (a)(1)(C) – the following property is subject to forfeiture to the United States:  Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Section 1344 of this title or any offense constituting "specified unlawful activity", as enumerated in Title 18 U.S.C. Section 1956(c)(7).  Such funds are subject to seizure pursuant to 18 U.S.C. Section 981(b). It is no defense to forfeiture and seizure that such funds have been comingled with or replaced by cash from legitimate sources. 18 U.S.C. 984. Based on the facts set forth in this affidavit, I believe there is probable cause to seize the items listed in Attachment "C" which are proceeds of bank fraud.

_//_

2



## OVERVIEW OF THE FRAUD SCHEME

11.     From June 2007 to present, a cash advance fraud scheme utilizing pre-paid credit cards was engaged in by multiple suspects throughout the United States, in states to include, Indiana, Montana, and Arizona, among other places. The fraud scheme is conducted in the following manner: in concert with others, an individual enters a bank, approaches a teller and requests a cash advance or balance check on his/her prepaid credit card. This suspect requests a cash advance on the card in amounts ranging from $8000 to $9500. The transaction should be denied, due to insufficient funds. However, this suspect directs the teller call his/her credit card company's customer service department an 888/866 number that co-schemers control. The teller either dials the number at the direction of the suspect or the suspect uses the teller's phone or his/her cell phone to call the 888/866 number. The teller believes he/she is talking to the issuer of the card company and is told the customer has funds available and proceeds to instruct the teller on how to get the cash advance to go through. Once contact was made with the accomplice purporting to work in a credit card company's customer service area, that accomplice would then provide personal identifiers to the teller on the suspect's behalf. The customer service representative would then direct the teller to hit a series of buttons on the credit card machine including a verification number. Consequently, the card would then clear for the amount requested and the cash would be given to the suspect.

12.     The prepaid cards are called Rush Card, Greendot, and Netspend. They bear Mastercard or Visa brand. They are commonly referred to as "credit cards," but they require the user to deposit funds, or "load" the card account, before they can be used. Thus, they really are debit cards. These cards can be applied for online or in person at, for example, a check cashing store.

13.     Based on my knowledge, training and experience, I know that the numbers entered by the bank teller were accepted because the specific set of numbers pushed on the card reader caused the machine to conduct a "forced transaction".

14.     A "forced transaction" is a known banking procedure in which credit card companies accept the transaction after it is reentered or forced through the system by a merchant or bank at their discretion. In the case of the fraud scheme, the suspect's accomplice instructed the bank teller to unsuspectingly hit keys on the machine that caused it to force the transaction, thus resulting in the transaction being approved. The exact keypad numbers are known to law enforcement and financial institutions and will not be described herein due to the sensitivity of the information. However, once the force code is entered into the machine, then any series of fabricated numbers could be entered into that machine and the card reader will accept it. Once the machine accepts the transaction the bank teller then provides the bank fraud suspect with cash.

15.     Upon completion of these forced transactions, the suspects would leave the bank with the fraudulently obtained funds and make contact with their "handlers." The suspects would then use FedEx, Money Gram, Western Union or directly deposit into a bank

3



account various amounts – commonly fifty percent – for the benefit of the operators of the fraud scheme.

## INFORMATION FROM FBI INFORMANT

16.     On or around the first week of December 2007, FBI Special Agent Greg Rice of Bozeman, MT, interviewed a Confidential Human Source or informant (referred here in as FBI-CHS-1). FBI-CHS-1 expects payment for relocation, dislikes Kevin Dixon, and has a criminal record related to deceit. Still, FBI-CHS-1 provided the FBI consistent and reliable information during the course of this fraud scheme investigation. The information was corroborated in recorded phone calls and by events detailed below. FBI-CHS-1 was shown an unmarked photograph of a black male. The FBI-CHS-1 identified the person in the photograph as that of Kevin Dixon also known as James Dixon. The true identity of the person in that photograph is known to law enforcement as James Kevin Dixon, a.k.a. Kevin Dixon. FBI-CHS-1 was also shown an unmarked photograph of a white female. FBI-CHS-1 identified that person as Patience Isaacs. The true identity of the person in the photograph is known to law enforcement as Patience Isaacs.

17.     FBI-CHS-1 told FBI SA Rice that he/she is a former friend and associate of James Kevin Dixon. FBI-CHS-1 is aware Dixon also utilizes the names Kevin Dixon, James Dixon, Kentari, and Cheese (Cheèz). The FBI-CHS-1 has known Dixon for several years. FBI-CHS-1 advised that the FBI-CHS-1 was aware that Dixon worked as a pimp and had a number of prostitutes working for him. Dixon was primarily a pimp in Las Vegas, Nevada and in California. He earned a considerable amount of money working prostitutes. FBI-CHS-1 stated that when Dixon was younger he used to be a member of the Crips street gang in Portland, Oregon. Dixon has a number of gang-related tattoos on his body including one on his hand that reads "KBG" which stands for Kirby Black Crip. FBI-CHS-1 advised that in September 2006 Dixon came to visit the FBI-CHS-1 in Bozeman, Montana. Dixon stayed at a residence known to the FBI-CHS-1 for a few nights. While Dixon was in Bozeman he was stopped on an illegal left turn, and arrested for possession of cocaine and marijuana. He was subsequently put on house arrest in Bozeman, Montana with an ankle monitor for a few months for that charge.

18.     The FBI-CHS-1 observed and was aware that Dixon was under house arrest at a residence in Bozeman, MT ("The Bozeman Residence"). Dixon was employed part of the time while under house arrest. After he got off house arrest in July or August of 2007 he was not employed. Dixon has not worked since July or August of 2007.

19.     While Dixon was residing at Bozeman Residence, the FBI-CHS-1 learned that debit cards were being mailed to that address in the name of Patience Isaacs. Dixon directed Isaacs to order the cards and have them mailed. Dixon repeatedly asked the FBI-CHS-1 whether or not the credit/debit cards had been mailed to the Bozeman Residence. During the time that Dixon was in Bozeman approximately four different prepaid credit cards arrived at the Bozeman Residence. Dixon and Isaacs both told the FBI-CHS-1 about the cards. The FBI-CHS-1 did not see the cards. The FBI-CHS-1 was aware that Dixon had a mail key to the mail box.

4



20.     During the time that Dixon was still in Bozeman, Dixon had the FBI-CHS-1 drive Dixon and Isaacs to a bank located in Livingston, Montana. The bank was located in a shopping center. Isaacs went into the bank. The FBI-CHS-1 observed that while Isaacs was in the bank, Dixon was very nervous and commented that Isaacs was taking too long. Isaacs finally came out of the bank after a long period of time and told Dixon "I got it, $9000".

21.     At this time, the FBI-CHS-1 was not aware of the true reason why Isaacs went into the bank, but was told by Dixon that it had to do with a loan of some kind. Sometime shortly after the FBI-CHS-1 drove them to the bank, the FBI-CHS-1 figured out that Dixon and Isaacs had committed fraud. The FBI-CHS-1 then refused to take them to any more banks and didn't allow them to use the FBI-CHS-1's car. Approximately three days after that incident, Dixon went and bought a car.

22.     FBI-CHS-1 was aware that credit cards belonging to Dixon and Isaacs finally arrived via mail in Bozeman on or around July 2007. FBI-CHS-1 learned from Dixon that he needed to leave Bozeman because he had caused Isaacs to commit bank fraud in the Bozeman area by going into various banks and getting cash advances with her credit cards. The FBI-CHS-1 became aware that there was no money "loaded" on these cards or that the cards had no value. Dixon told the FBI-CHS-1 that he was sending Isaacs into the banks. Isaacs also told the FBI-CHS-1 about the scheme. Dixon told the FBI-CHS-1 that Isaacs would go into the banks and get a minimum amount of cash of $2000 and as much as $9000. FBI-CHS-1 knew that Dixon purchased a vehicle in Bozeman with the cash they defrauded from the banks. Dixon told FBI-CHS-1 that credit unions were better to go into because it seemed Dixon and Isaacs got more money from them.

23.     Dixon told the FBI-CHS-1 that he had a contact who worked at an unspecified bank that was an accomplice and was helping him with the fraud scheme. Dixon also stated that Isaacs somehow made contact via the telephone while Isaacs was in the bank. The accomplice on the phone would somehow make the funds available for the fraud.

24.     Sometime in October or November 2007 Dixon called the FBI-CHS-1. He told the FBI-CHS-1 he was somewhere in Minnesota. He asked the FBI-CHS-1 to mail to Dixon a cable bill belonging to Isaacs. Dixon told the FBI-CHS-1 that the bill had Isaacs' address on it and it would help Dixon and Isaacs get more credit cards.

25.     FBI SA Rice asked the FBI-CHS-1 if he/she was aware of an associate of Dixon's known only as Whooch or Whoochie. The FBI-CHS-1 advised he/she knew Dixon had an associate known as Whooch. Whooch was a cousin of Dixon and was a member of gang known as the Bloods in California. The FBI-CHS-1 provided a physical description for Whooch a.k.a. Whoochie as that of a black male, dark complexion, 35-37 years of age, 5'6" to 5'7", large build, over 160 pounds, black hair, and covered with some tattoos. Whooch also has prominent strong facial features.

5

26.     The FBI-CHS-1 was later shown an unmarked photograph of a black male whom the FBI-CHS-1 identified as Whooch a.k.a. Whoochie (sometimes spelled Wooch). The individual in that photograph is known to law enforcement through DMV photos as the target Donald Wayne Taylor.

27.     The FBI-CHS-1 stated that Dixon had talked with Taylor over the phone and discussed the fact that Dixon was coming to see Taylor for business purposes. The FBI-CHS-1 possessed two phone numbers for Taylor (a.k.a. Whooch) in his/her cell phone. The FBI-CHS-1 showed FBI SA Rice the phone which had the name of Whooch on his/her cell.  Whooch's numbers were 510-207-5271 and 702-420-4943.

28.     On or around 12/5/07 the FBI-CHS-1 met with FBI SA Rice. The FBI-CHS-1 advised that Whooch called the FBI-CHS-1's cell phone on or around 12/4/2007 and stated that he was aware Dixon had been arrested in Pennsylvania. He asked the FBI-CHS-1 how it was possible Dixon got caught because Dixon never went into the banks. Taylor told the FBI-CHS-1 that he believed that it was "Feddy Mac" (Robinson) who "ratted" on Dixon because it was Dixon who was out in Indiana with Feddy Mac.

29.     Wooch called the FBI-CHS-1 from various numbers including 916-421-1377. Taylor also stated that he could be reached on his other cell numbers (previously identified above) of 510-207-5271 and 702-420-4943. Taylor also specifically instructed FBI-CHS-1 to purchase throw away phones or "Trac" phones when calling him or discussing business over the phone. Taylor displayed knowledge of how to purchase various phones and use different numbers to elude discovery by law enforcement.

30.     Taylor told the FBI-CHS-1 that he was concerned about getting hold of the car that Dixon was driving because there was evidence of Dixon's frauds in the car. Taylor told the FBI-CHS-1 "if they get the car they get everything". Taylor also made statements to the effect that Taylor was in the hotel room where Dixon was prior to Dixon's arrest. Taylor did not have any of Dixon's belongings or incriminating evidence when he left Dixon's hotel room. Taylor also told the FBI-CHS-1 that the first bank Isaacs went into that Dixon had to go in and get her.. FBI-CHS-1 stated that during the commission of one of the fraud schemes, Dixon entered the bank and provided assistance to Isaacs. Taylor speculated that may have contributed to Dixon's arrest but wasn't sure.

31.     The FBI-CHS-1 showed FBI SA Rice the received calls from his/her cell phone. The call read "12/14/07 6:57, 5 minutes, Whoochie". Another call from Whoochie read "8:00 p.m., lasted 5:11 from 702-420-4943. Those calls were not recorded.

32.     On or around 12/5/2007, FBI SA Rice provided the FBI-CHS-1 with a tape recorder and authorized the FBI-CHS-1 to make recorded telephone calls of Taylor. On or around 12/11/2007 at approximately 8:50 a.m. Whoochie a.k.a. Taylor began to call the FBI-CHS-1. The FBI-CHS-1 recorded one of those calls with the recording equipment provided by the FBI. One of the numbers he called from was 916-424-8371. During one of those phone calls Whooch expressed concern and seemed worried about getting a hold of the car belonging to Dixon subsequent to Dixon being arrested.

6

## 2/13/08 FBI UNDERCOVER RUSE FOR A CASH ADVANCE BY FBI-CHS-1

33.   Between 2/1/2008 and 2/12/2008 the FBI-CHS-1 made various consensually monitored phone calls to Donald Taylor. A number of these calls were made to Taylor's cellular telephone number of 702-490-4943, which was identified as Taylor's number.

34.   FBI SA Rice instructed the FBI-CHS-1 to tell Taylor that the FBI-CHS-1 had been in contact with Kevin Dixon and that Dixon was in federal custody in Billings, Montana. The FBI-CHS-1 was to tell Taylor that the FBI-CHS-1 needed to help Dixon obtain bail money and that Taylor wanted the FBI-CHS-1 to talk to Taylor and that Taylor was to instruct the FBI-CHS-1 on how to conduct the credit card cash advance scheme. This was the same scheme for which Dixon and Patience Isaacs had previously been arrested by the FBI. This was the same scheme previously conducted by Dixon and Isaacs in Montana and other states.

35.   On or around 2/1/2008 the FBI-CHS-1 telephoned Taylor in the presence of the Affiant and another FBI Agent. The FBI-CHS-1 complied with the captioned instructions of the Agents. Taylor instructed the FBI-CHS-1 to first purchase a rechargeable credit card. After the FBI-CHS-1 obtained that card, Taylor instructed the FBI-CHS-1 to call Taylor back.

36.   On 2/8/2008 at approximately 12:08 p.m. the FBI-CHS-1 again contacted Taylor at 702-420-4943. The FBI-CHS-1 called from an undercover cellular phone under the control of the FBI and lent to the FBI-CHS-1 by the FBI. Taylor answered his phone and the FBI-CHS-1 told Taylor that the FBI-CHS-1 had obtained a card. Taylor told the FBI-CHS-1 that he would call the FBI-CHS-1 back after he obtained a calling card. At approximately 12:13 p.m. on 2/8/08 Taylor called the FBI-CHS-1 back in the presence of the interviewing Agents. SA Rice noted the time and date. The phone number on the FBI-CHS-1's cell phone read "Unavailable". This phone call was recorded by the interviewing Agents.

37.   During this recorded conversation Taylor was upset with the FBI-CHS-1 for trying to talk about the fraud scheme over the phone. Taylor then instructed the FBI-CHS-1 that he/she need to go to a bank. He instructed the FBI-CHS-1 that once outside the bank the FBI-CHS-1 was to call Taylor. Taylor would then provide another telephone number to the FBI-CHS-1 and the FBI-CHS-1 was to call that person once inside the bank. The person at that other telephone number would be in on the scheme. Once inside the bank the FBI-CHS-1 was to ask for money on the card. The teller would then swipe the card. The card would show that no money was available. The FBI-CHS-1 would then provide the teller the same phone number given to the FBI-CHS-1 by Taylor. Taylor told the FBI-CHS-1 that the teller would then speak with that person on the other end of the phone (an accomplice) and the accomplice would somehow make the transaction happen. Taylor told the FBI-CHS-1 that after the FBI-CHS-1 got the money that the FBI-CHS-1 would then send Taylor his cut of the money and another person would get their cut of the money. The FBI-CHS-1 agreed to call Taylor at a later date.

7



38. On 2/12/2008 at approximately 10:39 a.m. the FBI-CHS-1 again made a consensually recorded phone call to Taylor at 702-420-4943. Taylor did not immediately answer. A minute or two later Taylor called the FBI-CHS-1 back from his telephone number 512-909-7954. Based upon prior instructions by Taylor, the FBI-CHS-1 told Taylor that the FBI-CHS-1 was outside a bank. He told the FBI-CHS-1 he would call him/her back. A few minutes later Taylor again called back from an unavailable telephone number. During this conversation Taylor provided the FBI-CHS-1 with a telephone number of 1-866-550-9530. He instructed the FBI-CHS-1 to go into the bank and try to obtain a cash advance from anywhere from $9,200 to $11,000. The transaction would be declined. Once that occurred the FBI-CHS-1 was to then call the telephone number of 1-866-550-9530. Taylor told the FBI-CHS-1 that a person would answer that phone and would be an accomplice and know what was going on. The FBI-CHS-1 was then to hand the phone to the teller and has the teller speak with the person on the phone. That person would then help the teller through a process. At some point the FBI-CHS-1 would get the cash advance. Once the FBI-CHS-1 received the money from the bank the FBI-CHS-1 was to call Taylor back.

39. On 2/12/2008, FBI SA Rice and Detective Mary Ann Ranguitch of the Bozeman Police Department, and the FBI-CHS-1 jointly went to Big Sky Western Bank (BSWB), 4150 Valley Commons Drive, Bozeman, Montana. With the assistance of the bank's Security Officer a private room and telephone were acquired. Another recorded phone call was then conducted with the help of the FBI-CHS-1. FBI SA Rice instructed the FBI-CHS-1 to telephone the number of 1-866-550-9530 from the bank's phone. At approximately 11:10 a.m. the FBI-CHS-1 dialed the captioned telephone number. Upon calling that number a female answered the telephone. The FBI-CHS-1 explained to the female that the FBI-CHS-1 was having problems with his/her credit card at the bank. The FBI-CHS-1 handed the telephone to Detective Ranguitch who pretended to be a bank teller for BSWB. The female on the other end of the phone identified herself as "Liz." Liz then asked Detective Ranguitch about the card machine and gave instructions to do something known to law enforcement but not disclosed herein, enter the card number, and enter $9200. Detective Ranguitch pretended as if she was pressing the numbers on the card machine. She then told Liz LNU that the card machine read that the transaction had cleared and that the FBI-CHS-1 would get their money. The call then concluded shortly after that.

40. At approximately 11:16 a.m. in the presence of FBI SA Rice, a call was again recorded wherein the FBI-CHS-1 called Taylor back at 702-420-4943. Taylor did not answer. A few minutes later Taylor called back the FBI-CHS-1 from another telephone number of 512-909-7954. The FBI-CHS-1 told Taylor that he/she had received $9200 in cash. Taylor told the FBI-CHS-1 that a percentage of the proceeds would now need to be split with some going to Taylor and some going to another unspecified person who was involved. Taylor instructed the FBI-CHS-1 to then send $1500 in cash via Federal Express to him. Taylor provided an address of **5924 Stallon Way, Sacramento, California 95823.** Taylor told the FBI-CHS-1 to go to a shoe store and purchase a pair of shoes. The FBI-CHS-1 was then to place the cash in the toe of the shoe and cover it with

8



paper. The Affiant then prepared a Fed Ex box as Taylor instructed and mailed $1500 in cash to Taylor at the captioned address the next day.

41.     Taylor then told the FBI-CHS-1 to deposit $4600 in cash to the other individual who had an account at Wells Fargo Bank (WFB). Taylor instructed the FBI-CHS-1 to get a WFB deposit receipt and write on it "Stupid Entertainment". The FBI-CHS-1 should then go to a WFB in Bozeman and call Taylor, he would then give the FBI-CHS-1 the WFB account number. The FBI-CHS-1 was to then wire transfer the money to that account. The FBI-CHS-1 agreed to do this but told Taylor that the FBI-CHS-1 had to go to work very soon and might not be able to send the money until tomorrow. Taylor became angry upon hearing this and said he wanted the money sent today.

42.     On the evening of 2/12/2008 and morning of 2/13/2008 Taylor left three or four threatening voice mails on the cell phone referenced above and under the control of the FBI. Taylor called that cell phone number approximately 31 times. He did not leave messages on every occasion. He also called the personal cell phone number of the FBI-CHS-1 personal cell phone number.

43.     On the morning of 2-13-2008 at approximately 11:35 a.m. the FBI-CHS-1 again telephoned Taylor at 702-420-4943. The call was not answered. A few minutes later the FBI-CHS-1 received a telephone call from male who identified himself only as "Fast". FBI-CHS-1 advised that the FBI-CHS-1 had previously met Fast and that Fast was a pimp and associate of Taylor and Dixon. The FBI-CHS-1 told Fast that he/she was looking for Whoochie aka Taylor. Fast told the FBI-CHS-1 to call Taylor at 512-443-1774, Room 204. Fast said that Taylor said that he doesn't care what the FBI-CHS-1 has going on, but Taylor was in a "bad situation right now with his "folks". The FBI-CHS-1 provided an excuse as to why he/she was late in delivering the money to Whoochie. Fast stated that "somebody is on his (Taylor's) ass" and that Taylor has to pay somebody else. The FBI-CHS-1 said that he/she was going to send Taylor his money.

44.     The FBI-CHS-1 then called 512-443-1774, Room 204. A recording that answered the phone stated that it was La Quinta Inn in Austin, Texas. The call was transferred to room 204 and Taylor answered the telephone. The FBI-CHS-1 provided some excuses as to why he/she couldn't have sent the money on 2/12/08. Taylor stated that he had to borrow money to pay off the people to whom he owed money and was angry.

45.     The FBI-CHS-1 told Taylor that he/she was ready to deposit the money into the Wells Fargo Bank (WFB) account of Stupid Entertainment and Fed Ex the parcel containing the money he/she owed to Taylor. Taylor could be overheard talking to someone else on another phone and asked that person "what's the account number". A few moments later Taylor then stated that the FBI-CHS-1 should deposit the money into the WFB account of "Stupid Entertainment". He provided an account number of 8249995419 to the FBI-CHS-1. Taylor told the FBI-CHS-1 to make the deposit available for the same day (2/13/08).

9

46.     FBI SAs Rice and Jon Sorenson then accompanied the FBI-CHS-1 to Wells Fargo Bank located at 211 West Main Street, Bozeman, Montana. Under the direction and supervision of FBI SA Rice and in both his and that of FBI SA Sorenson the FBI-CHS-1 filled out a deposit slip, went to a teller window and deposited the funds to the same captioned account provided to the FBI--CHS-1 by Taylor. The teller stated the cash deposit would be available the same day.

47.     At approximately 12:17 p.m. on 2/13/08, and following the deposit by the FBI-CHS-1, Taylor called the FBI-CHS-1 on the FBI-CHS-1's cell phone number. The FBI-CHS-1 told Taylor that he/she made the deposit. Taylor then told the FBI-CHS-1 to send the other money owed to Taylor via Western Union. FBI-CHS-1 explained that the FBI-CHS-1 and Dixon were not allowed back to do business at Moneygram or Western Union in Bozeman because Dixon had alienated the manager. The FBI-CHS-1 told Taylor that the FBI-CHS-1 would now send the cash in a Fed Ex package over night. Taylor then told the FBI-CHS-1 that he would call the FBI-CHS-1 back. Taylor then hung up. A few minutes later Taylor called the FBI-CHS-1 back. Taylor told the FBI-CHS-1 to put $2500 in the package. He then told the FBI-CHS-1 "these n----'s ain't to be fucked with" and expressed worry and suspicion over the fact the FBI-CHS-1 had problems sending the money. Taylor stated that he feels that something was wrong. The FBI-CHS-1 reassured Taylor and agreed to send the Fed Ex containing money owed to Taylor and told him he/she would send it today. The FBI-CHS-1 asked Taylor to whom to address the Fed Ex package. Taylor stated that the package should be sent to 5924 Stallon Way, Sacramento, California. Taylor told the FBI-CHS-1 to address it to "Jones" at that address. FBI SA Rice later purchased a pair of shoes at a local store and placed $1400 in cash inside the shoe (not $2500 as instructed). The shoes were black and white colored "vans" with the label of "Route 66". The shoes were placed in a package and mailed via Federal Express. FBI SA Rice confirmed later through the Fed Ex tracking number (862779397004) that the package was delivered to 5924 Stallon Way, Sacramento, CA.

48.     At 12:37 p.m. on 2/13/08 the FBI-CHS-1 called Taylor back at 512-443-1774 Room #204. During that conversation the FBI-CHS-1 told Taylor that the Fed Ex package was being sent to him and gave him a tracking number of 862779397004.

49.     FBI SA Rice later obtained hotel records from La Quinta Inn for 2/13/2008 and 2/14/2008. The records show that Donald Taylor, 2405 Fairview, New Castle, California, 95658, had checked into #204 on 2/13/08 and checked out on 2/14/2008 and paid cash for the room of $86.25. The telephone number for La Quinta in was also listed on the records as 512-443-1774, the same number given to FBI-CHS-1.

50.     Wells Fargo Bank account records for the Stupid Entertainment account show the deposit made by FBI-CHS-1 on 2/13/08 at the Bozeman, MT branch. In addition, on 2/13/08, a deposit of $6,200.00 was made into the Stupid Entertainment account at a Wells Fargo Branch in Dallas, TX. Donald Taylor was at a La Quinta Inn motel in Austin, TX on this date. The photograph of the depositor is shows a white male, but Taylor is black.

10

## WELLS FARGO BANK INVESTIGATION & BANK RECORDS

51. On 3/25/2008, FBI SA Rice was contacted by Wells Fargo Bank (WFB) investigator Darran Mazaika of Pleasant Hill, California, (referred herein as WFB Investigator). The WFB investigator had been conducting an investigation into a cash advance ring that was arrested on 2/27/2008 in Tucson, Arizona. I subsequently obtained items which included bank statements for Charles E. Barksdale, Stupid Entertainment and Niesha Jackson, deposit records, withdrawal records, subject mug shots, and bank surveillance photographs. The WFB bank statements and signature cards showed that WFB account number 8249995419 and WFB account number 8785764823 are under the business name of Stupid Entertainment LLC, 2506 64th Ave., Oakland, California, and that the account holder is Charles E. Barksdale, California driver's license number of B7553843. The account record also shows a date of birth of 2/12/1981 and SSN.

52. According to the report written by the WFB investigator the WFB investigation identified at least seven individuals who had committed fraudulent cash advance transactions in Texas, New Mexico, and Arizona since approximately September 2007. WFB identified the particular suspects by name. The WFB investigator also obtained WFB surveillance photographs that corresponded with many of the fraudulent cash advances and obtained corresponding known photographs of the same suspects in order to confirm the identity of the suspects. It was easy to identify suspects because the people used real names and identity documents at the banks.

53. WFB estimates the loss from this Arizona-based ring as approximately $200,150. The WFB report stated that WFB investigators were told by Tucson PD about the arrest of the Arizona-based ring in Tucson and about the fact that police determined that the suspects had made cash deposits into the WFB account belonging to Charles E. Barksdale and/or Stupid Entertainment. The WFB report states that as a part of the WFB investigation, searches were conducted of WFB account databases. As a result the WFB investigator found a number of accounts for Charles E. Barksdale, DOB of 2/12/1981, including account numbers 8249995419 (identified above) and 1889436083. The WFB report indicated that there were numbers of cash deposits and withdrawals between 9/2007 and 3/2008. The cash deposits were made in Arizona, Minnesota, Montana, and Texas. The majority of the cash withdrawals on the same accounts were made in the Sacramento, California area. The WFB investigator identified that one of the toll free phone numbers used by the ring was that of 866-550-9530. This is the same toll free number previously provided to FBI-CHS-1 by Donald Taylor during the ruse that was conducted in Bozeman, Montana by the FBI on or around 2/12/2008 and identified in paragraph 71 of this affidavit.

54. The WFB investigator also reviewed withdrawal records from Barksdale's account and obtained withdrawal slips associated with the account. One of the withdrawal slips dated 2/5/2008 contained the name of Niesha Jackson. The WFB investigator searched WFB databases and found several bank accounts for the same Niesha Jackson. According to the WFB report, bank statements from Jackson's three bank accounts (1171569617, 3265354401 and 7553471686) showed a number of cash

11

deposits and withdrawals from September 2007 through March 2008. I reviewed a spreadsheet produced by WFB summarizing the account activity for Charles E. Barksdale and for three total accounts including those in the name of Stupid Entertainment. The spreadsheet showed that between 2/16/2007 and 3/5/2008 there were multiple & regular cash deposits into his accounts. Barksdale's accounts showed regular cash deposits. The individual deposit amounts varied from deposit to deposit and included but were not limited to deposits of $1,250, $2500, $4500, $4600, $4750, $5000, $6150 and $8000. The spreadsheet shows several individual deposits into these accounts for the exact amount of $4750 at a time. Between 2/16/2007 and 3/5/2008 the deposits totaled $132,200 and the withdrawals totaled $78,600.

55. I am aware through information gained during the fraud scheme ruse conducted with FBI-CHS-1 in February 2008 in Montana that following the commission of a ruse in which Donald Taylor was told that the FBI informant had acquired $9200 in a fraudulent cash advance, Taylor instructed FBI-CHS-1 to deposit $4600 or half of that money he/she obtained through the fraud scheme into the Stupid Entertainment's account, account number 8249995419. I reviewed account statements for Barksdale's WFB account, number 8249995419. On 2/13/2008 there is a deposit for $4600 into his account. This is consistent in that it is the same date that Donald Taylor caused FBI-CHS-1 to deposit $4600 into the Stupid Entertainment account.

56. Furthermore the WFB investigator's report provided several WFB bank surveillance photographs of suspects depositing cash at various WFB branches around the U.S. into Charles Barksdale's Stupid Entertainment WFB account, account number 8249995419.

57. FBI SA Rice and I reviewed two other WFB surveillance photographs which corresponded with two more deposits made into Barksdale's Stupid Entertainment WFB account, account number 8249995419. The first deposit and photograph is a deposit for $4500 on 9/7/2007 at 12:15:55 p.m. The second photograph is for a deposit for $4500 at 14:34:14. Both surveillance photos were taken at WFB in Bozeman, Montana. Both photographs depict a black male wearing a "Phat Farm" tee-shirt. The individual in the photograph is recognizable as the suspect previously identified by the FBI as Kevin Dixon, aka Cheez. Based upon the fraud scheme investigation I am aware that on 9/7/2007 there were two fraudulent cash advances committed in Bozeman, Montana. One was for $9000 at the Rocky Mountain Bank and the other was for $9000 at First National Bank. These two cash advances correspond with the dates of the deposits made by Dixon. As was previously documented in previous paragraphs the perpetrators of this scheme instruct their co-conspirators to pay them 50% of the illegal proceeds. In these instances the loss at 2 banks was $9000 each. Dixon made two deposits of $4500 each.

58. The WFB investigative report also contained bank surveillance photographs and withdrawal receipts of two individuals who made withdrawals at WFB branches located in the Sacramento, Oakland, and San Francisco, California areas from all the captioned WFB accounts associated with Barksdale and Jackson. FBI SA Rice and I reviewed these photographs and corresponding withdrawal slip records and identified the following

12



withdrawals were conducted from WFB account number 8249995419:

    a. 2/5/2008 at 13:55:17 a cash withdrawal was conducted for $17,000 at the North Natomas Branch, 2262 Del Paso Road, Sacramento, California.

    b. 2/09/2008 at 17:50:18 a cash withdrawal for $2000 located at Union Trust Office, 2 Grant Avenue, San Francisco, CA.

    c. 2/19/2008 at 17:31:10 a cash withdrawal for $8500 at the North Natomas Branch, 2262 Del Paso Road, Sacramento, California.

59. I am aware that this WFB account number is the same account number identified during the FBI ruse previously described in this affidavit. The withdrawal record information provided WFB indicates all the withdrawals were made by Charles Barksdale, California drivers license B7553843. This driver's license number corresponds to WFB account applications for Barksdale. I have reviewed the surveillance photographs which correspond to each of these withdrawals. Each photograph depicts a black male standing at a teller window. The black male has long dreadlock-like hair in a pony tail style. FBI SA Rice and I have compared the photographs to a known photograph of Charles E. Barksdale that was obtained from the Sacramento Sheriff's Department and the California DMV. Both FBI SA Rice and I concluded the surveillance photographs closely resemble the known photos of Barksdale.

60. I also reviewed WFB account records for Niesha Jackson. Jackson maintains approximately six bank accounts with WFB. Between 2/16/2007 and 3/5/2008 Jackson's accounts shows individual deposits ranging in amounts from $1600, $2500, $3000, $6500, $4750 and $7500 at a time. The total number of deposits was $163,258. The WFB account applications for Jackson's account identified as 1277546469 and 8122885620 list her sole owner of the account. This application is signed and dated 5/21/2007and provides the following information: address of 9705 D Street, Apartment B, Oakland, California, SSN, DOB of 6/29/1979, California driver's license number of B7109857. Employment on the application is listed as "Student". Jackson is also a co-signor on WFB account number 1171569617 with a minor identified as Jamal C Douglas. Douglas is listed as "a minor by Niesha Jackson".

61. I reviewed the WFB records for deposits made into the account for which Jackson is a co-signor with Douglas, WFB account number 1171569617. The account statement shows a deposit into the account on 10/9/2007 for $4750. The deposit was made at the WFB South Riverside branch at 1128 S. Riverside Avenue in Medford, Oregon. An accompanying photograph from WFB surveillance cameras at the Riverside branch in Medford, Oregon on 10/9/2007 shows a clear quality photograph of a black male with a striped blue shirt and a brown cap. The individual in the photograph was clearly recognizable to FBI SA Rice as Christopher Smalls. FBI SA Rice previously identified Smalls as a co-conspirator in this fraud scheme, based on his investigation into fraud activity in the state of Montana, which points out that Smalls committed a fraudulent cash advance for $9500 on 10/9/2007 at the Bank of the Cascades in Medford, Oregon,

13

Anaconda, Montana and Cody, Wyoming. As set forth above, the individuals who actually go into the banks and commit the fraudulent cash advance take the illegal proceeds send back to co-schemers, often by deposits into the bank accounts of Niesha Jackson and Charles Barksdale, 50% of the illegal proceeds that they earn. In this case after Smalls committed the fraud scheme at the Bank of the Rockies for $9500, he is then seen at WFB in Medford, Oregon depositing $4750. That amount represents 50% of the $9500 cash advance.

62.     WFB account # 7552471686 statements for Niesha Jackson shows a purchase on 12/24/2007 from Louis Vuitton in San Francisco in the amount of $2,180. On 1/28/08, a charge from Saks Fifth Ave in Phoenix, AZ appears on this account. On 2/19/08, a charge from Gucci in San Francisco, CA appears on this account in the amount of $2,500. The WFB account # 8249995419 for Stupid Entertainment shows a purchase on 2/27/08 at "High Line Jewelers" in Hayward, CA in the amount of $2,000. On 1/30/08, a purchase was made at a Gucci store in the amount of $3,500. On 12/24/2007, two purchases were made at the Louis Vuitton store in Los Angeles, CA in the amount of $547.20 each against a US Bank account #153457803119 for which Niesha Jackson is the accountholder and the address of record with the bank is **10070 Willard Parkway #232, Elk Grove, CA.** On 2/19/08, a purchase at the Gucci store in San Francisco, CA appears on this account in the amount of $1,364.43. On 12/24/07, a Fed Ex package was shipped from Louis Vuitton at 8500 Beverly Blvd, Suite 774, Los Angeles, CA to Niesha Jackson at 10070 Willard Pkwy #232, Elk Grove, CA.

63.     On 4/17/2008, I conducted employment checks with the State of California for the defendant, Charles E. Barksdale, Niesha Jackson, and Donald Taylor. The records indicate that none of these individuals have had any California employment over the last year. Furthermore the record checks also show that Stupid Entertainment has not filed income for any individuals.

64.     In Wells Fargo's bank surveillance photographs showing the person believed to be Barksdale, that person is wearing clothing described in Paragraph 10 of Attachment B.

## NEXUS OF THE PROEPRTY TO THE VIOLATION FOR SEIZURE:

65.     All of the above-listed Wells Fargo Bank accounts contain proceeds in violation of 18 USC 1344. These funds were obtained through the fraud scheme perpetrated by various suspects throughout the United States. Funds were deposited into these accounts which belong to Charles E. Barksdale, Stupid Entertainment, and Niesha Jackson. Documentation from bank records and personal interviews of various witnesses support these statements.

## FED EX RECORDS

66.     As set forth above, the fraud schemers utilized Federal Express services to transport proceeds of the criminal enterprise to various locations throughout that United States. The Suspects engaged in the fraud scheme would place cash in shoes or other. During the course of this investigation and in Consultation with bank investigators and other law enforcement officers, I have observed transfers of funds to and from the WFB accounts in paragraph 8. This transfer of funds caused these assets to be commingled and tainted by the fraud scheme.

items to disguise the true contents in the shipment. The Suspects would then ship via FedEx the packages with the proceeds to the addresses identified in this affidavit.

67.     During the course of the investigation, on 2/13/08 FBI SA Rice mailed a Fed Ex parcel to **5924 Stallon Way, Sacramento, CA** and put it to the attention of "Donald Jones". The parcel was sent because Taylor instructed FBI-CHS-1 to mail it as a cut percentage of the illegal proceeds owed to Taylor for a fraudulent cash advance allegedly committed by FBI-CHS-1. FBI SA Rice subsequently obtained Fed Ex records for parcels coming and going to and from **5924 Stallon Way, Sacramento, CA, and 2405 Fairview Lane, Newcastle, CA.** The following parcels and names were identified as a result:

> A. 7/25/07 – From: Donald Taylor, "Gohard on a Buck Ent., 2405 Fairview Lane, Newcastle, CA 95658 To: Jakan Taylor **5924 Stallon Way, Sacramento, CA 95823**

> B. I am aware that on 11/13/2007 a package was sent from Federal Express Patience Isaacs, 9140 N. Michigan Road, Indianapolis, Indiana (Telephone number of 702-366-3311; to: ATT Go Hard O.A.B., **5924 Stallon Way, Sacramento, CA 95823**. The date of this mailing corresponds with the same date of a cash advance fraud committed by Patience Isaacs at Main Source Bank in Crown Point, Indiana. The phone number listed on the parcel is the cell phone known to FBI SA Rice of Kevin Dixon.

> C. On 11/14/2007 a package was sent From: Mr. A.O.A.B. ent, telephone number of 702-366-3311, 119 W. Julia Martin, Apt. C, Bozeman, Montana 59715. To: Gohard O.A.B. **5924 Stallon Way, Sacramento, CA.** Mr. A.O.A.B. is known to FBI SA Rice as the initials for Kevin Dixon's business, "All On A Bitch". Gohard O.A.B. is known to FBI SA Rice as the initials for the business name for Taylor, "Gohard On A Bitch."

> D. On 1/30/2008 a package was sent From: Jamar Jordan, 2405 Fairview Lane, Newcastle, CA, telephone number of 702-420-4943 To: K'Ya Taylor, **5924 Stallon Way, Sacramento, CA 95823.** The phone number of 702-420-4943 is a cellular phone number known as a telephone utilized by Donald Taylor to communicate with FBI-CHS-1 as set forth above.

68.     Detective Brett Seach of the Indianapolis Metropolitan Police Department provided FBI SA Rice with a Fed Ex air bill he had previously obtained via subpoena during the course of the Indianapolis investigation. The Fed Ex air bill was dated 8/6/2007, tracking number 861740098083 and is from "William Dixon" at an address in Indianapolis, Indiana and "To: **Stupid Ent, Stupid Entertainment, (10)070 Willard Parkway, Apartment #232, (E)lk Grove, California 95757**". (The parentheses are in the original Fed Ex documentation.) The Fed Ex records indicate that the package was delivered on 8/7/2008 at that address in Elk Grove, California and that the package was

15

signed for by "L. Jackson". Detective Seach stated that he is aware that the address in Indianapolis, IN is the home address for Indiana CW3. To date, charges have not been filed against Indiana CW3, either state or federal. The telephone number of 317-339-7307 is also the cell phone number for Indiana CW3. Indiana CW3 is one of the co-conspirator's operating the fraud scheme in the Indianapolis area. His involvement is documented below. CW3 has a number of convictions for fraud-related activity.

69.    In addition, I conducted a review of Federal Express records I obtained. The records show multiple Federal Express parcels coming to and from two of the suspect addresses including: **10070 Willard Parkway, #232, Elk Grove, California, and 2451 Meadowview Road, #801, Sacramento, California.** The records show that between 8/1/2007and 12/26/2007:

> • Approximately nine Fed Ex parcels were delivered to **10070 Willard Parkway, #232, Elk Grove, California,** and **2451 Meadowview Road, #801, Sacramento,** California.

> • Approximately four of those parcels originated from the name of William or Bill Dixon in Indianapolis, Indiana, the area known to investigators where the co-conspirators of the fraud scheme were operating during the same time frame.

> • Approximately seven parcels were delivered to **2451 Meadowview Road, #801, Sacramento, California.**

> • Approximately four of these were sent from the name of William Dixon in Indianapolis, Indiana.

70.    The Fed Ex records indicate that on 8/14/2007 a parcel was sent from Bill Dixon, Indianapolis, Indiana, to **10070 Willard Parkway, #232,Elk Grove, California.** The package was signed for by "C. Barksdale". **10070 Willard Parkway, #223, Elk Grove, California** is the known subject address of the defendant, Charles E. Barksdale and is further described in paragraph 137 and 138 of this affidavit. The address of **2451 Meadowview Road, #801, Sacramento, California,** is an address identified by investigators of Nicole Sypert and is further described in this affidavit.

71.    The Fed Ex records also indicate that at least three of the captioned parcels delivered to **2451 Meadowview Road, #801, Sacramento, California,** contain the business name of "Big Face Entertainment."

## ADDITIONAL INVESTIGATION IN INDIANA

72.    Between November 2007 and April 2008 Detective Brett Seach of the Indianapolis Metropolitan Police Department and US Secret Service SA Wade Gault identified additional suspects as participating in this fraud scheme. They advised that one of the suspects arrested during the course of the Indianapolis investigation was James Moore. Moore currently has charges pending in Marion County, IN related to this fraud scheme. No offers or agreements related to cooperation have been made between law enforcement and Indiana Moore. Detective Seach stated Moore committed at least 4 cash

16

advance frauds at various bank branches in the Indianapolis, Indiana area. The loss from these frauds totaled approximately $15,000. Moore also committed approximately 3 other attempts at various bank branches in the Indianapolis area. As a result Detective Seach obtained a local warrant for Moore and arrested him. Following Moore's arrest Detective Seach obtained Indiana Moore's cellular telephone further described as a Nokia AT&T cell phone of 317-908-2028. Detective Seach searched Moore's cell phone contacts and located the name of Wooch, telephone number of 510-207-5271. This phone number is a number that is recognizable as a phone number previously utilized by Donald Taylor, aka Wooch (Whooch). It is one of the same phone numbers used by Taylor to call FBI-CHS-1 on past occasions.

73. Detective Seach advised that on 8/28/07 an individual identified as Sylvester Reeves was arrested by the Mishawaka, Indiana Police Department following an attempted cash advance fraud at the First Source Bank in Mishawaka, Indiana. Reeves has been charged by federal complaint, but he is currently in custody in Mississippi on unrelated state charges. Bank personnel were suspicious of his attempted cash advance transaction and they called the police. During the course of the arrest police officers also identified Indiana CW3 waiting in a vehicle nearby the bank. Indiana CW3 was detained and questioned by police officers. Police officers searched the car driven by Indiana CW3 and located maps of the area which identified the locations of several banks in Mishawaka, Indiana and South Bend, Indiana and how to get there from Indiana CW3's house.

74. Indiana CW3 was interviewed by Detective Seach and SA Gault. Indiana CW3 admitted to involvement in the fraud scheme. He stated that he knew an individual identified only as Wooch aka Donald LNU. He knew Wooch from the neighborhood that Indiana CW3 grew up in California. Indiana CW3 stated that he was recruited by Wooch to commit the CAS in Indiana. Indiana CW3 told Wooch that he did not want to be the one to go into the banks but would recruit other people to go into the banks, and have them commit the cash advance frauds. Indiana CW3 agreed to and did recruit Reeves and Moore. Indiana CW3 agreed to drive Reeves and Moore to the banks. Indiana CW3 was later shown an unmarked photograph of a black male by SA Gault. Indiana CW3 identified the person in the photograph as the person he knew as Wooch. The true identity of the person in the photograph was that of Donald Wayne Taylor aka Wooch, aka Whooch. CW3 has prior convictions for fraud offenses, and is providing information in hope of not being charged or receiving a lesser sentence. CW3 gave Det. Seach his phone records. They contained toll records for calls with numbers associated with Taylor, Dixon, Reeves, and Moore.

75. During the course of the Indianapolis fraud scheme investigation Detective Seach identified suspect Indiana CW1 as an individual who was committing cash advances with the same modus operandi. Indiana CW1 is cooperating in this investigation and provided statements to law enforcement in exchange for not being charged federally. Indiana CW1 was charged in Marion County, IN and pled guilty to Fraud on a Financial Institution. He was sentenced. CW1 has an extensive criminal history. In March 2008, Detective Seach interviewed suspect Indiana CW1 following Indiana CW1's arrest. Indiana CW1 told

17



Detective Seach the following facts regarding what he knew about fraud scheme operating in the Midwest: Indiana CW1 admitted to his role in the participating in the fraud scheme as outlined in this affidavit. He stated a female introduced Indiana CW1 to Wooch a black male from Sacramento, California at the Indianapolis residence of Indiana CW1. Indiana CW1 described Wooch as a black male with a dark complexion, approximately 6'0, 215 pounds, in his 30's, with a low haircut with waves, and facial hair on his chin. Indiana CW1, the female, and Wooch were in the car when Wooch laid out the fraud scheme to Indiana CW1. Wooch gave Indiana CW1 two different toll-free numbers to be used in the commission of the fraud scheme. Indiana CW1 stated the name of the operator on the other end of the toll free number was a female identified only as Kiesha and that she was in on the fraud scheme. Wooch drove Indiana CW1 to various banks during which time Indiana CW1 fraudulently obtained $21,000 in cash from the commission of the same CAS. Indiana CW1 gave Wooch 50% to go back to California and gave Wooch an additional, smaller cut for Wooch's own role.

76.     Indiana CW1 also recruited three females to commit the fraud scheme in Indianapolis and Greenwood, Indiana. After the three females gave Indiana CW1 the cash, he would wire the money via MoneyGram to someone in California. He was instructed to wire half of the money to Nicole LNU and didn't remember the name of the other person to whom he had to wire the money. Indiana CW1 stated that he also met a person named Nicole in Indianapolis through Wooch. Wooch then moved on and Nicole became Indiana CW1's "handler". Indiana CW1 picked out a photograph of Nichelle Sypert from a photo array. (Review of Drivers License, booking information, and MySpace pages shows that Nicole and Nichelle are twins.) CW1 said Nicole also told CW1 to to wire money to Barksdale and Nichelle. CW1's recruited females are on wire transfer records sending money to Barksdale and Nichelle Sypert in California.

77.     After wiring the money Indiana CW1 would call Nicole Sypert and give her the confirmation number to facilitate the wiring of the illegal proceeds to California. Indiana CW1 also stated that if he didn't call her with the confirmation number that he was told he would be excluded from the fraud scheme. He stated that the fraud scheme leaders would change the toll free number from time to time.

78.     Indiana CW1 stated that one of the three women who Indiana CW1 recruited to commit the fraud scheme was a female identified as Indiana CW2. Indiana CW2 was interviewed by Detective Seach and provided the below outlined information. To date, she has not entered into any cooperation agreements with law enforcement. Detective Seach had previously arrested and interviewed Indiana CW2 following the commission of a cash advance fraud she committed in Indianapolis area in July 2007. During the interview with Detective Seach, she admitted to her role in committing the fraud scheme and obtaining money from approximately two banks in Indianapolis area. Indiana CW2 also told Detective Seach that after she obtained the money she wired the money to California via MoneyGram. Detective Seach obtained via subpoena MoneyGram records detailing the transactions described by Indiana CW2. The records showed that on 7/20/07 Indiana CW2 wired $445 to Nichelle Sypert in Sacramento, California, and on 7/20/07 she wired $2500 to Charles "Varksdale" (with a V) in Sacramento, California.



She told Detective Seach that she was instructed to split the money she obtained from the bank to the two different people. CW2 has theft charges pending and theft convictions.

## INVESTIGATION REGARDING NICHELLE SYPERT

79.     During the course of the investigation, Detective Seach and SA Gault identified suspect Nichelle Sypert as having committed a cash advance fraud for $5000 on 6/22/2007 at Teachers Credit Union in Indianapolis, Indiana. She committed the fraud with a Rushcard pre-paid credit card, further described as card number 4227-9711-9359-6245. Detective Seach advised that a teller at Teachers Credit Union wrote down Nichelle Sypert's California driver's license number of B7553909 at the time of the cash withdrawal. Through California DMV Detective Seach obtained a copy of Nichelle Sypert's California driver's license which indicates her California drivers license number was B7553909 and lists and an address of 2451 Meadowview Road, Apartment, apartment 705, Sacramento, California. Evidence indicates that she has since changed apartments within that complex. (See below.)

80.     Western Union records show Nichelle Sypert on June 4, 2007 in Akron, Ohio wiring $1,000 to Nicole Sypert in Sacramento.

81.     MoneyGram records show Nichelle Sypert on June 23, 2007 in Indianapolis wiring $3,000 to Charles Barksdale in Sacramento.

## FRAUD SCHEME RING OPERATING IN TUCSON ARIZONA

82.     On 3/14/2007, FBI SA Rice was contacted by FBI Special Agent Brian Filbert of the FBI's Tucson Office. FBI SA Filbert advised that approximately 5 individuals who' were part of a cash advance fraud scheme ring in Arizona and had committed 23 counterfeit cash advances that primarily targeted Wells Fargo Bank branches.  The individuals had been arrested by the Tucson Police Department following a failed attempt at a local bank in Tucson, Arizona. FBI SA Filbert advised that the investigation by the FBI and Tucson PD had determined that the subjects had been wiring proceeds from the crime to the Wells Fargo Bank account of Charles Barksdale. FBI SA Filbert became aware that Barksdale was a suspect in FBI SA Rice's investigation.

83.     On 2/27/2008, a female attempted to conduct a fraudulent cash advance at Wells Fargo Bank branch in Tucson, Arizona.   The service manager realized she was conducting a scam and called the police.  When the police arrived they arrested the female for fraud.  During a post-arrest interview, she admitted to the fraud and advised that there were four other suspects down the street waiting for her. She called the four suspects via cell phone and had them come to the bank. The Tucson police then arrested them.

84.     When Tucson PD searched the suspect's vehicle, they found a receipt showing a $5,250 deposit on 2/19/2008 into an account titled: Stupid Entertainment LLC, Charles E. Barksdale, (account) #8249995419, DOB 2/12/1981, 2506 64th Avenue, Oakland,

19



California 94605". This account name and number previously identified during the course of the fraud scheme investigation. In addition, this is the account name and number used during the course of performing a ruse transaction with FBI-CHS-1 on or around 2/12/2008 in Bozeman, Montana.

85.  More than one of the four suspects in Tucson provided confessions to the police department admitting to conducting fraudulent cash advances at various banks and depositing the money into Barksdale's Wells Fargo Bank and Bank of America accounts. The FBI in Tucson later identified through interview that two of the schemers had been recruited by a black male they met in Las Vegas identified as "Charles" LNU, aka Sho. Sho is one of the street names known to law enforcement for the defendant Charles Barksdale.

## MYSPACE ACCOUNTS

86.  Based on information obtained during the course of this investigation, I conducted checks of MySpace – a social networking website at which individuals can create pages with personal profiles, blogs, groups, photos, music and videos. It is owned by Fox Interactive Media which is owned by News Corporation which has its headquarters in New York City. MySpace has a Groups feature which allows a group of users to share a common page and message board, this information cannot be seen non-members to the group and the moderator of the group can approve or deny requests to join.

87.  FBI SA Greg Rice located a web page for Patience Isaacs on MySpace.com, further identified as MySpace.com user 2020188 and listed as "www.MySpace.com/patiencediane". FBI SA Rice determined the web page identified as 2020188 belongs to Patience Isaacs because Isaac's photograph appears on the front page of that site. The name on the web address "patiencediane" (Patience Diane) is the first and middle name for Patience D. Isaacs. Isaacs' photograph on her MySpace page was compared to that on her Kentucky driver license photo. Patience Isaacs also has several photographs of herself with the phrase "Patience's Photos" written on these photographs. All of these are consistent with the identity of the defendant, Patience Isaacs. Included among the photographs of Isaacs photos are also photos of a black male who FBI SA Rice knows to be the defendant, Kevin Dixon.

88.  FBI SA Rice had identified through law enforcement record checks in NCIC that one of Dixon's aliases is known as "Cheeze" aka "Cheez". The name "Cheez" is clearly displayed in some of the photographs of the person recognizable as Kevin Dixon. Some of the photographs on Isaacs' web page contained photographs of Dixon and Isaacs together. Among those photographs is a photograph of Dixon, uploaded on November 18, 2007 showing him holding up nine bundles of $100 dollar bills, wrapped with $1000 money bands while seated in a car. This is notable because law enforcement is aware that the typical amount taken in Dixon and Isaacs credit card cash advance schemes is often $9,500. Another photo, dated November 13, 2007, shows Dixon seated in what resembles a hotel room with a caption typed under the photo that reads "You are not the police are you?". In addition, IMPD Detective Seach conducted additional searches of



MySpace for accounts belonging to suspects in this investigation. IMPD Detective Seach discovered Kevin "CHEEZ" Dixon, AKA Papi Keso, Mr. APAB has the MySpace profile of 121301671.

89. On 3/19/08, I conducted a MySpace check for Suspect Donald "Wooch" Taylor. I found two MySpace accounts with photos of Taylor for which he was the user. He uses the AKA Stupid Swoop and the MySpace accounts have user numbers 162209586, 50218050, and 49582679. On 5/9/08, I conducted additional MySpace searches for these accounts. I observed on account 162209586, a caption on the site that read "Go hard on a Buck Ent!" Help Wanted. This is the business name used on a FedEx package delivery on 7/25/07 – From: Donald Taylor, "Gohard on a Buck Ent., 2405 Fairview Lane, Newcastle, CA 95658 To: Jakan Taylor **5924 Stallon Way, Sacramento, CA 95823,** previously referenced in this affidavit. Taylor's photos appear on each of these pages and he is listed as residing in Sacramento. On 5/9/08, on MySpace account 50218050, there is a photograph of a black male hand holding approximately 23 $50 and $20 notes. The caption under the photo reads "I send a bitch to get my dividends". "Cheez" is listed under his friends and "Stupid Swoop" is listed under other suspect's MySpace friends list.

90. Nicole Sypert uses MySpace account number 58950694, images of Nicole and the use of her name occurs on the page. The MySpace page lists that her name is "Nicole" and her DOB is 3/9/1980 – the true birthdate of Nicole Sypert. The site lists that she lives in Sacramento. "Stupid Swoop" is listed under her friends.

91. Nichelle Sypert also uses a MySpace accounts, number 229830119 and 54149265. Images of Nichelle can be seen and references to her are made on this page. On her MySpace pages, there are references to her being 28 years old, residing in Sacramento and DOB of 3/9/1980. "Stupid Swoop" is listed under her friends.

92. Based on my knowledge, training, and experience in criminal investigations to include wire and computer fraud investigations, I know that users of MySpace.com utilize laptops, personal computers, desktops, thumb drives, digital cameras, and other electronic devices which connect to the Internet to download, upload, receive, and transmit text and photographs to their MySpace.com profiles.

## LOCATIONS ASSOCIATED WITH SUSPECTS

93. On 4/21/08, U.S. Postal Inspector Michael Muniz confirmed the following addresses are associated, e.g. they receive mail at these addresses, with the following persons:

- 2405 Fairview, Newcastle, CA – Don Wayne Taylor and Jacqualine Nancy Corbella-Taylor;
- **10070 Willard Parkway #232, Elk Grove, CA** – Pamela Flentroy, Brieia Barksdale, and Chuck Barksdale;
- **2451 Meadowview Rd #801, Sacramento, CA** – Nichelle Sypert,

21



Christina Sypert, and Ronnette Singleton,

USPI Muniz also said that Nichelle had on file a change of address form from 2451 Meadowview Rd. Apartment 705 to Apartment 801 at the same street address.

## RECORD CHECKS

94. On 1/23/08, I conducted a search of the Secretary of State's website for the State of California. I went to the California Business Portal on this web-site and searched Limited Liability Corporations registered with the state for the name of Stupid Entertainment. Stupid Entertainment LLC is an active business in the State of California and filed with the state on 6/19/2006. The LLC is licensed under # 200617210210. The Registered Agent for the company is listed as Charles E. Barksdale, 2506 64th Avenue, Oakland, California, this is the same address listed as the business address.

95. A criminal history check for Barksdale shows that Charles Edward Barksdale, DOB 2/12/1981, and FBI number of 539709KB3 has a criminal history in the state of California. The record shows an address of 2506 64th Avenue, Oakland, California and describes Barksdale as a black male, 6'0", 150 pounds, black hair and brown eyes. The records show aliases for Barksdale of Charles Flintroy, Frederick Baker, Chuckie and Sho. The records indicate that Barksdale is a validated gang member of G-Mobb/Killa Hoe Camp Gang in Sacramento.

96. On 4/16/2008, I received responsive documentation from the California DMV. The DMV documentation shows Niesha Jackson as a 2006 Mercedes, License Plate # 6CAZ073 registered in her name with a mailing address of **10070 Willard Parkway #232, Elk Grove, CA 95757**. In addition, Charles Barksdale has a 2004 BMW, License Plate #5TWJ796 in his name with a mailing address of 2506 64th Ave, Oakland, CA 95605.

97. I obtained information from the Sacramento County Sheriff's Department that on 4/01/08 at his time of booking on charges unrelated to this affidavit, Charles Barksdale stated that his address is **10070 Willard Parkway #232, Elk Grove, CA.**

98. The Sacramento County Sheriff's Office provided FBI SA Rice with records for Niesha Nicole Jackson, DOB 6/29/1970 and an FBI number of 478176WA8. The records describe her as a black female, 5'1", 120 pounds, black hair and brown eyes. Niesha Jackson's criminal history includes convictions for fictitious obligations.

99. California DMV records show a record for Taylor with an address of 2405 Fairview Lane, Newcastle, CA. He has a DOB of 12/30/1970 and described as 6'1", 210 pounds.

100. Information provided by the Sacramento County Sheriff's Department indicates that on 4/6/08, Donald W. Taylor was arrested at the **5924 Stallon Way, Sacramento,**

22

CA address.

101.    FBI SA Rice conducted record checks with the California DMV for Nicole Annette Sypert, DOB 3/9/1980. DMV records indicate that Nicole Sypert's address is **2451 Meadowview Road, #801, Sacramento, CA**. She is described as 5'2" 125 pounds.

102.    Earlier this month, I spoke with FBI SA Brian D. Alvarez, JTTF Coordinator of the Sacramento Field Office. On May 12, 2008, Alvarez provided photographs and descriptions of the premises set forth in Attachment A, which Alvarez said had been obtained by agents or officers at his request.

103.    On 5/8/2008, I spoke with Placer County Sheriff's Deputy Glaspell regarding the Newcastle address. He also stated that a "For Sale" sign was on the property. Also in may, FBI agents visited the address using a ruse. They spoke with two elderly occupants, who did not have the surname "Taylor."

104.    On 5/13/08, FBI Agents and other law enforcement officers who are members of the FBI Safe Streets Gang Task Force conducted surveillance at **5924 Stallon Way** in Sacramento, CA. At approximately, 10:15 am, Task Force Officers observed a green Mitsubishi sedan pull up to the front of the residence. A black male strongly resembling the known photographs of Donald Taylor exited the vehicle. A black female and a small child then entered the vehicle and it drove away. The black male remained behind and shortly thereafter entered the garage of the residence and then closed the garage.

## CONDUCT AFFECTED INTERSTATE COMMERCE

105.    Based on my training and experience in conducting bank and wire fraud investigations, I believe that the suspects' conduct affected interstate commerce. The suspects entered banks throughout the United States at which they withdrew funds. In these various cities in which the fraudulent withdrawals occurred, the suspects would either deposit funds into Wells Fargo Bank accounts controlled by Barksdale and Jackson or they would send FedEx packages or money the wire via Moneygram.

106.    The transactions conducted at Wells Fargo Bank branches throughout the United States, to include, Montana and Arizona, affected interstate commerce, as did the withdrawals at banks doing business outside the State of California, including Rocky Mountain Bank in Bozeman, MT, First National Bank, American Federal Savings Bank and Sky federal Credit Union and others. These banks are headquartered in several different states, including but not limited to Arizona and Montana.

## CONDUCT AFFECTED FEDERALLY INSURED BANKS

107.    According to information I obtained from the Federal Deposit Insurance Corporation's website: http://www2.fdic.gov/idasp/main_bankfind.asp, Wells Fargo is a federally-insured bank that maintains branches at various locations in the State and Eastern District of California. In addition, Big Sky Western Bank, Rocky Mountain

23



Bank, among others, are federally-insured banks. Sky Federal Credit Union is federally insured by the National Credit Union Administration (NCUA), a U.S. government agency.

## EVIDENCE TO BE SEARCHED/ PERMISSION TO SEARCH COMPUTERS

108. Based upon my training and experience, and upon the training and experience of other law enforcement personnel with whom I have consulted, I believe that the Suspects identified in this affidavit used and/or use Computer Hardware at his/her residences "Attachment A" in order to facilitate the fraudulent scheme described in this affidavit.

109. I know that the terms "records" and "documents" and "correspondence" include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, correspondence, or materials, their drafts, or their modifications may have been created or stored, including, but not limited to, any handmade form (such as writing); any mechanical form (such as printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic storage device, such as floppy diskettes, hard disks, flash drives, backup tapes, CD-ROMs, optical disks, other memory storage devices, personal digital assistants (PDAs) or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

### Seizure of Electronic Evidence

110. Based in part on my experience and in consultation with SSA Brian Korbs, a computer forensic examiner for the US Secret Service, I know that:

Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or (2) the items may have been used to collect and store information about crimes (in the form of electronic data). Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are: (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for information about crimes.

Based on my further knowledge, training, and experience, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

The volume of evidence: Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file

24



names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of data search on site.

Attempted deletion of electronic records and information: Electronic records and information can remain on computer storage media, such as computer hard drives, for an indefinite period of time. Even when a computer user attempts to delete records and information from a computer storage medium, the records and information may still exist and can be recovered through computer forensic techniques. These computer forensic techniques can be time-consuming, and often it would be impractical to do them on site.

Technical Requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction. In many cases, the evidentiary data can be backed up to government owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

> 1. Based on the above facts and circumstances and information, permission is requested to search all above-described computer systems and peripherals found at the search locations, and to search those items as set forth in Attachment B.

25

2. Note on the duplication of computer storage media. The agents will initiate the search by making a duplicate, or "image," copy of the computers, hard drives, and digital storage devices found on the premises. They will first attempt to image the media on site, but if that is impractical, they will take the media. The agents will then use the duplicate image copies to search for the items listed above.

3. Note on hidden and encrypted data. Law enforcement personnel will search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized, as set forth herein.

4. Computers to be returned. If the computers found are not needed for evidentiary purposes, they will be returned within 60 days of the date the warrant is signed.

## CONCLUSION

111. Based on my knowledge, training and experience from fraud investigations and also based on my consultation with other law enforcement officers, I am aware that individuals engaged in cash advance fraud schemes commonly use computers and computer equipment to store information including that set forth in Attachment B. I also am aware that individuals engaged in these fraud schemes commonly keep their computers and computer equipment in their residences and move these items as they change residences.

112. Based on the foregoing, I respectfully submit that there is probable cause to believe fruits, instrumentalities and evidence in violation of Title 18 U.S.C. Secs. 1344 – Bank Fraud, will be found at the residences and locations identified as:

- **10070 Willard Parkway #232, Elk Grove, CA** – this address is used by various suspects associated with this fraud scheme, FedEx packages were sent to this address, bank accounts in Niesha Jackson's name are associated with this address, DMV records show this is the address of record for Niesha Jackson, and Charles Barksdale provided this address to Sacramento County Sheriff's at the time of his April 2008 arrest, and US Post Office confirmed that Chuck Barksdale receives mail at this address.

- **2451 Meadowview Road, Apt. 801, Sacramento, CA 95832** – this address is used by various suspects associated with this investigation, multiple FedEx packages have been shipped by cooperating witnesses to this address, this is the address of record with the CA DMV for Nicole Sypert and US Post Office confirmed Nichelle Sypert receives mail at this address.

- **5924 Stallon Way, Sacramento, CA 95823** – this address is used by Suspect Donald Wayne Taylor, he receives mail at this address and multiple FedEx packages have been sent to this address, and FBI SA Rice mailed a FedEx parcel to this address, and law enforcement officers observed Donald Taylor on 5/12/08.

113. Based on the foregoing, I respectfully submit that there is probable cause to arrest Donald "Wooch" Taylor for violating Title 18 U.S.C. Secs. 1344 – Bank Fraud.

114. Based on the foregoing, there is probable cause to believe that at the locations in Attachment A there is located the things set forth in Attachment B, which are fruits, evidence, and instrumentalities of the bank fraud scheme described above.

115. Based on the foregoing, there is probable cause to believe that the property seized constitutes or is derived from proceeds traceable to violations of 18 USC 1344 (Bank Fraud) and "specified unlawful activity" as defined in 18 USC 1956 (c)(7). Therefore, the property is subject to forfeiture pursuant to 18 USC 981(a)(1)(C). Funds in accounts outlined in Attachment "C".

I therefore request the Court grant me authorization via warrant to search to enter onto these premises.

I swear under penalty of perjury that the above facts are true and correct to the best of my knowledge and belief.

Kelly M. Shintaku, Special Agent
United States Secret Service

Subscribed and sworn to before me this $14$ day of May 2008, at Sacramento, California.

GREGORY G. HOLLOWS
Honorable Gregory G. Hollows
United States Magistrate Judge

Reviewed and approved as to form

_____
Matthew D. Segal
Assistant U.S. Attorney

27

## ATTACHMENT A

**10070 Willard Parkway #232, Elk Grove, CA** – an apartment complex in which unit #232 is marked by the front door, on the left side. The complex is called "Agave." The buildings are three stories accessible by stairs. The buildings are tan in color. Unit #232 is located in Building 4 and on the second story.

**2451 Meadowview Road # 801, Sacramento, CA 95832** –
This is a two story apartment complex called Meadow Glen Apartments. The building is beige colored stucco with maroon accents. It is a gated complex. There are covered parking spaces throughout the complex.

Unit 801 is located on the first floor of a two story apartment building in the complex. Building #8.

**5924 Stallon Way, Sacramento, CA 95823** – This is a two story single family residence. The front door is located to the right of the garage. The residence is tan with brown trim.

## ATTACHMENT "B"

1. Fed Ex records, documents, receipts or boxes of any kind.

2. Bank records of any kind to include, deposit slips or receipts, withdrawal receipts, cash advance receipts, credit card receipts, wire transfer records, for any all accounts belonging to or associated with Niesha Jackson, Nicole Sypert, Donald Taylor, Charles Barksdale, Kevin Dixon, Patience Isaacs, Eric Mayo, Assantay Robinson, Christopher Smalls, Stupid Entertainment,

3. Items used to commit the fraud, including personal organizers, telephone address books, telephone bills, photographs, and papers and documents consisting of names and/or lists of numbers.

4. Luxury items to include jewelry, Gucci and Louis Vuitton branded products.

5. Any type of records to include, but not limited to, ledgers and journals which record any receipt of funds, any credit or debit receipts or payments regarding the fraud.

6. Any credit, debit, pre-paid or stored value cards to include Mastercards, Visas, Discover Cards, American Express Cards, Gift Cards, Retail Store Cards and other financial institution and documents related to such cards.

7. Evidence of fraudulent purchases, foreign or domestic, including, but not limited to, real estate, vehicles, appliances, electronics, luxury items, or securities. Also, money in any form including but not limited to money orders, traveler's checks and cashier's checks, and cash of more than $500.

8. Cell phones of any kind and the contents inside of those cell phones to include but not limited to the contacts, text messages, and call logs.

9. Loose SIM cards.

10. Articles of clothing worn by the Suspects in the fraud scheme to include: blue/black and white striped nip front hoodie jacket, a white zip front hoodie sweatshirt, a red and white striped shirt, orange/green/white zip front hoodie sweatshirt and white t-shirt with orange image of a male on it.

11. Printed photographs, printed pages, or any documents associated with myspace.com and any and all of the subjects' web pages.

12. Wire transfer records of any kind

13. Phone records of any kind for any an all cell phones or land line accounts.

14. Any and all documents or records pertaining to Stupid Entertainment.

1

15. Black and white colored shoes further described as "Vans."

16. Hotel receipts, gas receipts, or any other kind of receipts as evidence of purchases made while traveling.

17. Any and all information relating to identities of persons other than the defendant including, but not limited to originals or copies of drivers licenses, and photographs for drivers licenses, social security cards, credit statements, bank account statements, personal checks, counterfeit checks, credit statements.

18. Any documents relating to the rental of any storage unit, post office boxes, or mail drop business, or safety deposit boxes.

19. Documents evidencing the obtaining, secreting, transferring, concealment, and/or expenditure of proceeds of the crime including any and all cash assets.

20. Any and all documentation related to other people possibly recruited as co-schemers, including addresses or telephone numbers, including folders, correspondence, hand written notes, address books, telephone records, computer records, e-mails any documentation reflecting additional names, addresses, telephone numbers, and other information identifying personal information.

21. The contents of any and all wall or floor safes, briefcases, or other locked containers or areas which could contain cash, and/or documents pertaining to transfer of assets, deposit or withdrawal of funds, or credit cards.

22. Books, records, receipts, notes, ledgers and other papers relating to the transportation, postal mail packaging, mailing documents, ordering forms, confirmation notices, e-mail confirmations, used to purchase or acquire merchandise.

23. Any and all documentation containing the names and addresses of any financial institutions including maps showing the locations of those institutions, whether electronic or paper.

24. Any and all firearms including handguns of any kind.

25. Any and all documentation pertaining to or containing the name of Big Face Entertainment

26. Articles of personal property and documents showing concealment of money and assets from the fraud, including books, receipts, records, vehicle records, bank statements and records, business records, money drafts, letters of credit, United States and Foreign currency, money orders, cashier check receipts, wire transfer receipts, passbooks, bank checks, and records and keys of safe deposit boxes and storage lockers

2

27. The term "records," "documents," and "materials," include all of the foregoing items of evidence in whatever form with "whatever" meaning records, documents, or materials, their drafts, or their modifications that may have been created or stored, including any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly; any photographic form (such as microfilm microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph, records, printing or typing); any electrical, electronic or magnetic form (such as tape recording, cassettes, compact discs, or any information on an electronic or magnetic form), more fully described below.

## Any computers to include:

28. File servers, desktop computers, laptop computers, mainframe computers, and storage devices such as hard drives, Zip disks, and floppy disks, computer routers, switches, telecommunications fiber cables, and computer network equipment, that were or may have been used as a means to commit fraud.

29. Any electronic storage device capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and using electronic data, in the form of electronic records, documents, and other materials recording on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed disks, external hard drives, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices, that were or may have been used as a means to commit fraud.

30. All records including bank account records, e-mail correspondences, saved web pages, etc.

31. The term records include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form.

32. Computer content and connection log files, including dates, times, methods of connecting (e.g., Telnet, FTP, http), ports used, telephone dial-up caller identification records, and any other connection information or traffic data for computers that were or may have been used to commit fraud.

33. Computer-related documentation, meaning any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any computer hardware, software, or related items that were or may have been used to place fraudulent orders and/or to commit fraud.

34. Computer passwords and data security devices, meaning any devices, programs, or data - - whether themselves in the nature of hardware or software - - that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic

3



data records, and that were or may have been used to place fraudulent orders and/or to commit fraud. Such items include but are not limited to data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

> A. Note on the seizure of computer systems and components. The seizure of computer systems or computer system components, including hardware and software, is specifically authorized as necessary by this search warrant, not merely to the extent such computer system components constitute fruits and instrumentalities of the criminal activity described above, but also for the purpose of conducting off-site examinations of their contents for evidence or fruits of that criminal activity.

> B. Note on the duplication of computer storage media. The agents will initiate the search by making a duplicate, or "image," copy of the computers, hard drives, and digital storage devices found on the premises. The agents will then use the duplicate image copies to search for the items listed above. They will first attempt to image the computers on-site, but if that is impractical, they will seize the computers.

> C. Note on hidden and encrypted data. Law enforcement personnel will search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized, as set forth herein.

> D. Computers to be returned. If the computers found are not needed for evidentiary purposes (i.e. for latent fingerprint examination or determined to be fraudulently purchased) and absent a further showing of good cause with the Court, they will be returned within 60 days of the date the warrant is executed.

4



## ATTACHMENT C

All funds located in the below-listed accounts at the Wells Fargo Bank:

- # 1889436083    Charles Barksdale
- # 7193582496    Charles Barksdale
- # 8249995419    Stupid Entertainment (Barksdale is signer)
- # 8479433735    Charles Barksdale
- # 8785764823    Stupid Entertainment (Barksdale is signer)
- # 1171569617    Niesha Jackson
- # 1277546469    Niesha Jackson
- # 3265354401    Niesha Jackson
- # 7553471686    Niesha Jackson
- # 7912156853    Niesha Jackson
- # 8122885620    Niesha Jackson